169 So. 291

### SHELL PETROLEUM CORPORATION v. LUCAS.

#### 6 Div. 856.

Supreme Court of Alabama.

June 11, 1936.

Rehearing Denied July 16, 1936.

Cabaniss & Johnston and Jos. F. Johnston, all of Birmingham, for appellant.

Perry & Powell, of Birmingham, for appellee.

BOULDIN, Justice.

 Workmen's compensation cases are reviewed by certiorari. The inquiry is: Does the record disclose a valid decree? A bill of exceptions is permitted as part of the record to the end that the evidence may be presented. In such case this court looks to same solely for the purpose of finding whether there is any evidence to support the trial court's conclusions of fact.

We are not concerned with the weight of the evidence. If any evidence, or reasonable inferences therefrom, tend to support the findings of the trial judge, his judgment is final and conclusive. Ex parte Little Cahaba Coal Co. (Baughn v. Little Cahaba Coal Co.), 213 Ala. 596, 105 So. 648; Ex parte Paramount Coal Co. (Williams v. Paramount Coal Co.), 213 Ala. 281, 104 So. 753; Summit Coal Co. et al. v. Walker, 214 Ala. 332, 107 So. 905.

Eddie Lucas, a negro laborer, was injured while at work cutting or mowing the grass on the premises of the bulk-plant of Shell Petroleum Corporation in Birmingham. Without dispute he was doing company work on the company's premises for pay, and under the orders of Mr. Melton, the plant agent, in charge of the plant and grounds.

The sole issue here is whether Lucas was at the time an employee of the company or an employee of Melton, personally, paid by him out of his own pocket?

Lucas had, theretofore, been on the regular weekly pay roll as an employee for the company, but had ceased to have that status. At this time he was what was called the "handy man," or "flunky," at the plant, working on any job he was called upon to do.

Two main points are stressed by petitioner:

1. That under the regular set-up of the company, employees were required to make application to be approved at the New Orleans office. Evidence discloses such rule was not in practice made to cut off all discretion of the men at the head of plant activities in employing casual labor as needed.

For example, Lucas had the daily task of cleaning up the company office under control of the office force, for which he was paid a weekly wage, inferentially from funds of the company. He went immediately from this job to cutting grass under orders of Mr. Melton when and where the injury occurred.

Mr. Carter, the maintenance supervisor of the plant, used Lucas in his construction work, and caused "pay-roll" checks to be sent out from New Orleans payable directly to said employee. One of these checks, in evidence, was issued four days before this injury. The testimony of Mr. Carter, on cross-examination, warrants an inference that he had the authority to employ a man for the kind of work Lucas was doing, not for him only, but such work as other men in charge of plant activities should order him to do.

Ofttimes for small company jobs, washing cars, etc., Lucas was paid cash by the party ordering him to do the work, and the items turned in to the company on expense account. This was the practice of the state plant supervisor, the immediate superior of Mr. Melton.

Whether termed a plant supervisor or not, Melton's authority over the plant and grounds was supervisory in character. But Lucas' relation as an employee does not

turn alone on Melton's authority to hire or fire. If Mr. Carter had authority to keep around the plant a general servant or "handy man" to be put to company work by others as needed, to be paid for from company funds by the hour or by the job, through pay-roll checks or on expense accounts, Lucas was, while so engaged, an employee of the company. That such was the practice supports an inference that the company acquiesced therein.

2. It is insisted that, as a fact, Lucas was at the time in the personal employ of Melton, being paid out of his own pocket. Admittedly, Melton had a "petty cash fund" under his control, to be spent for such company business as he saw fit. True, he claims he was to keep receipts for such fund; that he did not pay Lucas therefrom, but out of his own pocket; this because he and regular employees under him were to do the work, and he used Lucas to help him out and relieve himself and regular servants. But Lucas testifies he sometimes got the money out of the safe, and took receipts. His accounts for the "petty cash fund" were not produced. So far as appears Lucas was paid from company funds for all company work, unless Melton was an exception. Lucas testifies his pay averaged around $6 per week.

Without prolonging the discussion, we cannot say there was an entire absence of evidence that Lucas was in the employ of the company at the time of his injury. This, and not the apparent weight of the evidence, is controlling here.

Affirmed.

ANDERSON, C. J., and GARDNER and FOSTER, JJ., concur.